UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| THERESA RINEHART, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:06-cv-0688-DFH-TAB |
| | ) | |
| CITY OF GREENFIELD, et al., | ) | |
| | ) | |
| Defendants. | ) | |

ENTRY ON JUDICIAL REVIEW OF ADMINISTRATIVE TERMINATION

On March 22, 2006, the City of Greenfield terminated the employment of
plaintiff Theresa Rinehart as a firefighter with the Greenfield Fire Department.  In
state court, Rinehart sued the City and others involved in her termination on
several different grounds.  Defendants removed the action to federal court because
Rinehart alleged several federal constitutional violations actionable under
42 U.S.C. § 1983.  After removal, the parties and the court agreed that the court
should give expedited consideration to her request for judicial review, under the
applicable Indiana police and firefighter merit law, of the City's decision to fire her.
See Ind. Code § 36-8-3-4(f) – (*l*) (judicial review of employment actions against
merit police officers and firefighters).  The parties have filed with the court the
record of the administrative proceeding that led to Rinehart's termination.  After
briefing, the court heard oral argument on March 2, 2007.

The case stems from the unfortunate death of an infant on September 8, 2005. The infant choked at home and stopped breathing. Her mother called for help. Paramedic Rinehart and emergency medical technician Scott Johnson were among the first responders to arrive. The infant still was not breathing and her heart had stopped. Rinehart and others started artificial respiration and chest compressions and quickly took the infant to Hancock Regional Hospital. All efforts to revive the infant were not successful, and she died. A month later, the Greenfield Fire Department's medical director criticized Rinehart's written report for not including any mention of a problem with the pressure release valve on the artificial respiration equipment. The criticism quickly escalated to the point that the medical director and his successor revoked Rinehart's privileges to work under their oversight as a paramedic and then as an EMT. The City eventually fired Rinehart after a hearing that ended March 22, 2006.

Lest there be any misunderstanding, all parties in this case agree that the infant's death was not the fault of Rinehart or any other Greenfield Fire Department personnel. In addition, at all relevant times, Rinehart has had a valid certificate from the State of Indiana legally authorizing her to serve as a paramedic. In moving to fire Rinehart, the City made a choice not to criticize directly her actions on September 8, 2005. The City also chose not to criticize directly even her written report, which left out the information about the valve that the medical director later considered important. Instead, the City chose to proceed on a much narrower theory: (a) each firefighter is required to be able to

work as a paramedic or an EMT; (b) the medical director unilaterally revoked Rinehart's privileges to work under his supervision as a paramedic or EMT; so (c) Rinehart was unable to do her job and had to be fired.

As explained below, the City's narrow theory avoided any real dispute over the quality of Rinehart's work and turned the important substantive and procedural protections for firefighters into a hollow sham.  The City could not lawfully delegate such complete and final authority over Rinehart's employment to the department's medical director.  The City's actions violated Indiana law and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.  Rinehart is entitled to be reinstated immediately as a firefighter.

*Facts*

These facts are taken from the administrative record of the hearing that ended with plaintiff Theresa Rinehart's termination.  Rinehart became a full-time firefighter with the Greenfield Fire Department in January 1998.  After being hired, she qualified first as an emergency medical technician (EMT) and then as a paramedic.  EMTs are qualified to provide basic life support (BLS).  Paramedics are qualified to provide advanced life support (ALS), which can include the skill of inserting a breathing tube into a patient's trachea to provide artificial respiration.

The case here begins with an ambulance run on September 8, 2005.   The driver was Scott Johnson, who was an EMT, and he was teamed up with Rinehart. They went to a rural Hancock County home in response to a report of an unconscious person.   The patient was an infant who had choked and was not breathing.   By the time Rinehart and Johnson arrived, the infant's heart had stopped.   Her skin was blue from lack of oxygen.   Rinehart quickly inserted a breathing tube and began administering oxygen.   The tube insertion took just a few seconds, and Rinehart checked to make sure the tube was properly in the trachea rather than the esophagus.   The infant's skin began to turn more pink and less blue.   The change in the infant's skin color confirmed that the breathing tube was in the trachea.   However, the heart monitor still showed a "flat line" with no electrical or muscular activity.   The team was manually compressing the infant's chest to try to keep blood flowing.[1]

The team immediately moved the infant to the ambulance.   Johnson began driving away toward the hospital.   Rinehart was in back with the patient, in charge of the case, with help from the three volunteers.   At Rinehart's direction, Johnson stopped for a few seconds to pick up paramedic Jama Horning, who had been headed toward the scene in another fire department vehicle.   See Tr. 391-92;

---

[1]Rinehart and Johnson arrived at the same time as Andy Mohr, a volunteer firefighter in a rural township in Hancock County who was also a full-time firefighter and EMT with the City of Lawrence in northeastern Marion County. Volunteer firefighters Brad Stevenson and John Collins also arrived quickly and began helping.  All three accompanied Rinehart and the patient in the back of the ambulance on the trip to the hospital.

395-96.  At Rinehart's direction, Horning took over the airway management and oxygen treatment.

At the hospital, Rinehart, Horning, and Johnson turned control of the patient over to the hospital emergency room team but continued to assist them. Although the team tried to revive the infant for 45 minutes to an hour, the effort was not successful.  The infant was declared dead.  In the emotional aftermath of such a stressful event, paramedics Rinehart and Horning and EMT Johnson discussed the run.  During the discussion, Horning said she believed the pressure release valve (also called the "pop-off valve") had come off the bag-valve-mask used for artificial respiration.  (The valve is intended to ensure that the oxygen pressure does not rise to levels that might damage the lungs of the patient.)  Horning said that someone in the back of the ambulance had kept the apparatus working by putting a thumb over the valve location.  Tr. 294 (Johnson).  Horning believed the apparatus had continued to work  and that the malfunction was "no big deal."  Tr. 297-99 (Johnson).    After completing another ambulance run, and without assistance from Horning, Rinehart prepared the written report about the run involving the infant.  Her report said nothing about any problems with the bag-valve-mask.[2]

---

[2]Hospital staff later noted that when they saw the infant in the emergency room, the endotracheal tube for breathing was in the wrong place, in the infant's esophagus rather than her trachea. Tr. 458.  The witnesses who were involved in the transfer of the infant from the ambulance to a hospital bed described an incident in which the flexible tubing from the oxygen bottle to the mask was caught on something.  The assumption seemed to be that the properly placed tube
(continued...)

The evidence at the hearing indicated that Rinehart did not know or hear about the pop-off valve problem as it was occurring and as Horning and others solved it. Rinehart had turned over the airway management to Horning. Rinehart herself was concentrating on trying to insert a needle into a tiny vein in a dying infant in the back of an ambulance bouncing along rough country roads. Horning later mentioned the pop-off valve in no more than thirty seconds of a conversation after the infant had been declared dead. See Tr. 319 (Johnson).

The parties in this action agree that the infant's death was not the fault of Rinehart or any other Greenfield Fire Department personnel, or the result of any problem with the valve. This point deserves emphasis here. The testimony at the hearing indicated that this sad death of the infant and the controversy over Rinehart's actions on September 8th received a good deal of media attention. That attention might have created at least an impression that Rinehart acted wrongly in a way that contributed to the infant's death. The City does not contend here that she contributed in any way to the infant's death. The evidence before the Board and this court also indicates that Rinehart performed her paramedic duties competently and that nothing she did contributed to the death.

---

[2](...continued)
probably was dislodged at that point and that hospital personnel then quickly fixed that problem. Johnson, Mohr, and Rinehart all testified that when Rinehart first placed the tube, she placed it correctly in the trachea. The evidence before the Board was that the infant's skin quickly went from blue (cyanotic) to a pale pink (showing that she was getting some oxygen into her tissue) after Rinehart placed the tube and oxygen began to flow, and that the condition did not change before they arrived at the hospital.

Dr. William Rutherford, who was then the medical director of the Greenfield Fire Department, later reviewed Rinehart's written report.  On October 5, 2005, Dr. Rutherford met with Rinehart, Greenfield Fire Chief Lewis McQueen, and two other fire department officers to review the matter.  Tr. 74, 464.  Dr. Rutherford expressed concerns about the patient's airway and the operation of the pop-off valve on the bag-valve-mask.  Rinehart responded that the valve issue was "no big deal" and was "not important."  Tr. 465.  Dr. Rutherford became angry and told Rinehart that it was not her role to decide which medical issues were important on a run and what needed to be documented in a report.  On the spot, Dr. Rutherford revoked Rinehart's advanced life support (ALS) privileges under his medical license.[3]  Dr. Rutherford notified the Indiana Department of Homeland Security of his actions.  That department oversees the Emergency Medical Services Commission, which certifies paramedics and emergency medical technicians.  See Ind. Code § 16-31-3-1 *et seq.*

Dr. Rutherford also wrote a letter to Chief McQueen in October 2005 describing this meeting and his dissatisfaction with Rinehart.  The letter is City Exhibit 7 in the administrative record.  It is not signed, and it is erroneously dated "April 14, 2005."  McQueen testified that he received it in October 2005.  Tr. 80-81.  Dr. Rutherford concluded:

---

[3]It is not clear as a legal matter whether Dr. Rutherford actually had the authority to take this action, but the chief and other parties have assumed that he had that authority.

> At best, Ms. Rinehart has a monumental gap in her understanding of both the ethical and medicolegal ramifications of documentation. I would like to think that this is the problem, rather than the even more serious issue of intentional dishonesty. She doesn't appear to understand that rendering an incomplete account, however truthful the facts in the account, is not the same as telling the truth. Additionally, I am highly troubled by her apparent willingness to let an incomplete or misleading document stand, rather than to expose herself to some possible criticism of her care. The ironic aspect of all of this is that my best evaluation leads me to the conclusion that the child's death was probably not related to issues raised here.

City Ex. 7.[4]

On October 8, 2005, Chief McQueen responded to Dr. Rutherford's revocation of Rinehart's ALS privileges by assigning her to administrative duties. The assignment was to continue until Rinehart provided the chief with documentation from the medical director allowing her to perform paramedic duties under his medical license. City Ex. 6. Chief McQueen also warned Rinehart that she would need to provide this documentation by January 1, 2006, or he would begin termination proceedings because her position required her to be both a firefighter and a paramedic. *Id.*

On November 1, 2005, Dr. Rutherford was replaced by Dr. John Jones as the medical director of the Greenfield Fire Department. On November 16, 2005,

---

[4]Rinehart has noted the additional irony posed by the errors in Dr. Rutherford's own letter complaining about the accuracy and completeness of her documentation of the ambulance run.

Dr. Jones wrote that Rinehart could not operate as a paramedic under his medical license, either.  Ex. G.

The Indiana Department of Homeland Security (IDHS) conducted its own investigation of the September 8, 2005 incident.  On January 24, 2006, the IDHS issued findings.  The IDHS wrote regarding the valve issue:

> The pressure release valve is an essential component of the BVM (bag valve mask) and the BVM will not provide the appropriate artificial ventilations without the pressure release valve being in place and operating as intended. At some point in the [emergency] response, the pressure relief valve became separated from the BVM and was missing.  Based on the documentation provided by the Fire Department and others and the statements given, it was not possible to determine when the pressure release valve became missing. Paramedic Horning noticed the pressure release valve was missing after she had boarded the ambulance.

Ex. M at 2, ¶ 11.  The IDHS concluded:

> Respondent's [Rinehart's] failure to observe the absence of the pressure release valve violated the provisions of 836 IAC 4-9-3(f)(2) and endangered the health or safety of the emergency patient and, therefore, Respondent should be reprimanded and placed on probation for the renewal of professional education.

Ex. M at 3, ¶ 15.  The IDHS gave Rinehart six months to renew her professional education to the satisfaction of the IDHS.  It did not suspend or revoke her license as a paramedic.  Rinehart appealed the IDHS findings.  The court's record does not indicate the status of that appeal.

On January 31, 2006, Dr. Jones wrote a letter informing Chief McQueen that Rinehart would not be allowed to participate in providing either advanced life support (as a paramedic) or basic life support (as an EMT) under his medical license. City Ex. 8.[5] Before the eventual hearing on Rinehart's termination, Dr. Jones and Chief McQueen talked about the case roughly a dozen times. Tr. 120 (McQueen).

The next day, on February 1, 2006, Chief McQueen wrote a letter to Mayor Rodney Fleming recommending that Rinehart be terminated. Ex. A. The stated reason was Dr. Jones's letter of January 31, 2006. Chief McQueen concluded: "Since Theresa Rinehart was hired in 1998 to fill one of two new paramedic positions with the Greenfield Fire Department, and now is unable to function in that capacity, we have no option other than to terminate her employment." Chief McQueen sent a copy of the letter to Rinehart. Rinehart asked for a hearing in a letter dated February 3, 2006. That letter was premature, as discussed below. Chief McQueen and Mayor Fleming talked about the case roughly six to nine times prior to the eventual hearing. Tr. 120 (McQueen).

Chief McQueen restated this recommendation and reason in a letter to the mayor and to the City's Board of Works dated February 21, 2006. The Greenfield Board of Works consists of the mayor and two members appointed by the mayor.

---

[5]Dr. Jones testified that an official of the IDHS told him what to write in that critical letter. Tr. 155-56. That detail was not pursued in the hearing.

The Board of Works serves as the City's safety board for purposes of the applicable police and firefighter merit statute.  The Board of Works met on February 21, 2006.  Rinehart was at the meeting.  She was informed by the Board of the decision to go forward with termination of her employment.

The next day, on February 22, 2006, the Board of Works wrote a letter to Rinehart formally notifying her that Chief McQueen had filed charges against her at the February 21, 2006 meeting and had asked the Board to terminate her employment.  The letter told Rinehart that the Board would act on the request unless she requested a hearing within five days.  The letter told Rinehart that the charges "include neglect of duty, a violation of the rules of the Greenfield Fire Department, and conduct injurious to the public welfare." Ex. B.  The statute also requires the notice to identify the specific conduct at issue, see Ind. Code § 36-8-3-4(c)(3), and the letter stated:  "The specific conduct that comprises the charges are [sic] set forth in the attached Chief's letter to the Board of Works dated February 21, 2006 and the letter from John G. Jones, M.D., EMS Medical Director for Hancock Regional Hospital."  If she requested a hearing, it would be held on March 20, 2006.  She was also advised of her rights under the merit statute, including the rights to have counsel, to cross-examine witnesses, and to subpoena witnesses and evidence.  See Ind. Code § 36-8-3-4(c).

Rinehart again asked for a hearing.  The Board of Works held a hearing at Rinehart's request on March 20, 2006 and continued hearing additional evidence

on March 22, 2006.  Rinehart was represented by counsel.  The Board of Works heard testimony from Chief McQueen, Dr. Jones, plaintiff Rinehart, Scott Johnson, and Andy Mohr, and also received a summary of testimony from Jama Horning.

Dr. Jones is board-certified in emergency medicine.  He had served as the medical director of the fire department from approximately 1989 to 2000, and resumed that responsibility on November 1, 2005.  Dr. Jones had no first-hand knowledge about the September 8, 2005 ambulance run.  Tr. 185-87.  He had never observed Rinehart performing her duties as a paramedic.  Tr. 127, 164-65. He made his decision to revoke her privileges by talking with Chief McQueen, Dr. Rutherford, and a few other paramedics he did not identify.  Tr. 145.  He testified that he refused to talk with Rinehart about the case and his reasons for revoking her privileges.  Tr. 177-78, 180.  (That testimony is consistent with Rinehart's testimony on the point.)

Dr. Jones and Dr. Rutherford served as medical directors for the Greenfield Fire Department pursuant to a contract between the Greenfield Fire Department and Hancock Regional Hospital.  The contract provides in part: "The Greenfield Fire Department shall terminate the service of an individual paramedic's responsibilities in the performance of advanced life support skills upon receipt of written notice from the hospital that such individual failed to exhibit satisfactory performance during the course of his/her duties in accordance with current

protocols." Tr. 535 (quoted by City attorney).  Board of Works member Sarah Wolf said she was "deeply troubled with and concerned by the agreement with the hospital."  Tr. 558.  As explained below, the court is also troubled by that agreement, or at least by its interpretation in Rinehart's case.

Dr. Jones had no direct legal authority over Rinehart's certificate as a paramedic.  However, Indiana law requires any organization that provides paramedic services to have a medical director, either directly or jointly with a supervising hospital.  836 Ind. Admin. Code § 2-2-1(e).  In his capacity as medical director, according to Dr. Jones, he believed he had "sole discretion" to revoke Rinehart's privileges to work as a paramedic and EMT under his supervision.  Tr. 154.  He could not identify the legal source of that sole discretion.  *Id.*  He testified that he did not believe the Board of Works had the authority to overrule his decision.  Tr. 180.  When he was asked what might stop him from arbitrarily revoking a firefighter's privileges "just because you don't like them," he said he was "not that kind of person."  He agreed that his "internal moral compass" was the only constraint on his power to revoke any firefighter's privileges as a paramedic or EMT.  Tr. 181.

Dr. Jones was asked why he decided to revoke Rinehart's privileges.  He testified that the September 8, 2005 run "brought to light potential problems with airway management with Ms. Rinehart." Tr. 146.  He said that he saw "a pattern" that included two prior incidents in 2001 and 2003 with "problems of establishing

and maintaining an airway in critically injured or ill patients," as well as the documentation problem reported to him by Dr. Rutherford. Tr. 146-47. Dr. Jones had no first-hand knowledge about the two prior incidents. (Rinehart testified in detail about those incidents. See Tr. 360-70. Both incidents are far beyond the scope of the charges used as the basis for terminating Rinehart's employment. The evidence before the Board was not sufficient to support any finding that she had failed to carry out her duties properly on those occasions.)

Scott Johnson, Andy Mohr, and Theresa Rinehart testified in detail about the ambulance run of September 8, 2005. Even on the proverbially cold pages of the transcript, their testimony is riveting. They described in detail the extraordinary efforts made to save the life of the infant, as well as the emotional aftermath for the first responders.

The attorney advocating Rinehart's dismissal did not try to challenge the testimony of those witnesses about the events of September 8th. From the transcript, it is apparent that the City was content to rely on the theory that because Dr. Jones had revoked Rinehart's privileges, she simply had to be fired regardless of whether his decision was right or wrong.

After hearing testimony of all the witnesses and closing arguments, the Board of Works voted two to one to terminate Rinehart's employment. Board

member Sarah Wolf voted no and correctly warned the Board that the decision would be reversed in court.  Tr. 559-60, 562.

*Discussion*

Indiana law has long provided extensive substantive and procedural protection for firefighters and police officers.  One broadly applicable version of the "merit statute" is now codified as Indiana Code § 36-8-3-4.  The first version appears to have been enacted at least as early as 1905.  See Indiana Acts 1905, ch. 129 § 160 (providing that police and firefighters could be removed only by safety board and could be removed "for any cause other than politics, after an opportunity for a hearing is given, if demanded," and requiring written reasons for removal).    In its current form, the merit statute requires good cause for termination, Ind. Code § 36-8-3-4(b), and provides a right to an administrative hearing and judicial review, Ind. Code § 36-8-3-4(c)–(*l*).[6]

The City has argued for the separate consideration of the judicial review issues before a full trial on the merits of Rinehart's remaining claims.  Rinehart has raised three principal grounds for setting aside the decision to terminate her

---

[6]This particular merit statute applies to second and third class cities, and many other local government units.  Ind. Code § 36-8-3-1.  These protections do not apply to appointments to and removals from upper-level policy-making positions.  Ind. Code § 36-8-3-4(m).  This court had occasion to consider that provision in another case involving Mayor Fleming, Chief McQueen, and the Greenfield Fire Department in *Fortner v. Fleming*, 2001 WL 1781929 (S.D. Ind. Nov. 26, 2001) (granting defendants' motion for summary judgment on claims by former chief challenging demotion by new mayor).

employment, and some issues overlap with her constitutional claims.  First, she argues that the Board of Works lost jurisdiction to hear her case because it failed to hold the hearing within the statutory deadline.  Second, she argues that the notice she received was defective and failed to give her fair notice of the charges against her.  Third, she argues that the hearing amounted to a sham that denied her rights under the Indiana merit statute and deprived her of property without due process of law because the City had effectively delegated to the medical director the power to fire her.  The court disagrees with Rinehart on the first two issues but agrees with her on the third.

I.      *The "Jurisdiction" Issue*

Plaintiff Rinehart contends the Board of Works lacked "jurisdiction" to hear her case.  Her theory is:  (a) that Chief McQueen's letter to the mayor on February 1, 2006 was her notice that she was going to be terminated; (b) that she demanded a hearing in a letter of February 3, 2006; and (c) that no hearing was held within 30 days of her demand, as required by Ind. Code § 36-8-3-4(c).  The theory has two flaws.

First, the chief's letter of February 1, 2006 did not amount to notice that Rinehart would be fired and therefore did not trigger a right to hearing.  Chief McQueen's letter to Mayor Fleming, with a copy to Rinehart, said only that he was going to *recommend* that she be terminated.  Ex. A.  The chief's letter did not attempt to provide the notice required by Ind. Code § 36-8-3-4(c), including notice

-16-

of Rinehart's right to request a hearing.  The February 1st letter was only a preliminary step, not the statutory notice.  Under the merit statute, the chief has no power on his own to terminate a firefighter:  "Before a member of a police or fire department may be suspended in excess of five(5) days without pay, demoted, or dismissed, the safety board shall offer the member an opportunity for a hearing." Ind. Code § 36-8-3-4(c).  Rinehart could not torpedo the City's procedure by submitting a premature demand for a hearing before the Board had specified the charges and offered her the opportunity for a hearing, and by then complaining that the hearing was held too late.  The City provided the required statutory notice in the letter to Rinehart dated February 22, 2006.  That notice complied with the statute.  The hearing was held within 30 days after the notice was provided.[7]

Second, even if the Board had not held a timely hearing, Rinehart has not supported her argument with Indiana authority treating the 30-day hearing deadline as jurisdictional under Indiana law.  Under her theory, a town or city would lose all ability to fire or discipline a firefighter or police officer who had engaged in serious wrongdoing if the hearing were delayed for any reason (an illness, a snowstorm, or other emergency?) beyond the 30-day window.  This court finds no basis in Indiana law for treating the 30-day requirement as jurisdictional in the sense that the Board would lose the power to act at all to protect the public safety and the broader public interest.

---

[7]Rinehart might have had good reason, out of an abundance of caution, to send her February 3rd letter requesting a hearing to avoid any possible later argument that she had missed her opportunity to do so.

II.    *The Notice Issue*

Rinehart contends next that the City failed to give her the proper notice required by the merit statute because she was not informed of the charges against her.  The notice letter was the City's letter dated February 22, 2006, which said that the charges "include neglect of duty, a violation of the rules of the Greenfield Fire Department, and conduct injurious to the public welfare."  Ex. B.  That language tracked the statutory requirements for types of good cause to terminate but provided no specific information.  The next paragraph advised:  "The specific conduct that comprises the charges are [sic] set forth in the attached Chief's letter to the Board of Works dated February 21, 2006 and the letter from John G. Jones, M.D., EMS Medical Director for Hancock Regional Hospital."  The attached letter from Chief McQueen said the reason he recommended termination was the letter he received from Dr. Jones "stating that from this date forward Theresa Rinehart will not be allowed to participate in patient care, either BLS or ALS, under his medical license."  The attached letter from Dr. Jones contained one sentence and did not state any reason for his decision.

In this lawsuit, the City has repeatedly tried to broaden the issues.  The City has argued that the court should defer to Dr. Jones, Chief McQueen, and the Board of Works, and should recognize that Dr. Jones had good grounds for revoking Rinehart's privileges to work as a paramedic and EMT under his license. This effort to broaden the issues runs contrary to Indiana law.

-18-

The merit statute requires the notice to state "the specific conduct that comprises the charges."   Ind. Code § 36-8-3-4(c)(3).   In giving notice to Rinehart of its intent to terminate her, the City chose to proceed on a narrow theory that deliberately avoided the merits of the disputes over the September 8, 2005 run, Rinehart's report about it, and her disputes with Dr. Rutherford, Dr. Jones, and Chief McQueen.   The City's notice to Rinehart was limited to the narrow charge stated in the chief's letter:  because Dr. Jones said he would not allow Rinehart to work as a paramedic or EMT under his supervision, she had to be fired.   Under that theory, Rinehart had to be fired whether Dr. Jones was right or wrong, justified or not.   The notice to Rinehart said nothing about the underlying dispute, nor did it identify any particular rule of the department that Rinehart was accused of having violated.

Because the disputes about the September 8, 2005 incident and the written report were not specified in the charges, those issues could not be used to justify Rinehart's termination.   See *Coates v. City of Evansville*, 273 N.E.2d 862, 867 (Ind. App. 1971) ("A specific charge within one of the statutory categories must be set forth in any notice to a member of the fire department so that he may know why such action is being taken against him.").   The Indiana Court of Appeals explained in *Tryon v. City of Terre Haute*, 193 N.E.2d 377, 381 (Ind. App. 1963), that the "charges preferred in such a case must be full, clear, complete and concise in order that he can properly make a defense to said charges."   In *Tryon*, the court reversed a firefighter's dismissal because the notice was not specific about the

reasons. The court further explained: "the notice must apprise the accused of the acts of dereliction or personal defects which constitute the 'cause.' The purpose of the notice is not merely to inform of the time and place of the proposed hearing, but also to disclose the particular act or acts of delinquency or the particular defect constituting incompetency." *Id.*, quoting *State ex rel. Felthoff v. Richards*, 180 N.E. 596, 598 (Ind. 1932); accord, *City of Fort Wayne v. Bishop*, 92 N.E.2d 544, 547 (Ind. 1950) (police officer could not be required to defend herself as to any charges other than those given in the written notice; stated reasons "could not be supplanted, enlarge[d] or added to"); *City of Washington v. Boger*, 176 N.E.2d 484, 489 (Ind. App. 1961) (notice must show "with clearness and certainty what he is charged with"; this requirement is "more than a technicality; it is fundamental").

Under the statutory standards, as interpreted by the Indiana courts, Rinehart received sufficient and timely notice of the actual charge against her: she had to be fired because Dr. Jones had decided she would not be able to work as a paramedic or EMT under his license. As a corollary, however, the statutory notice requirements mean that the City could not convert the hearing into a trial on other charges, such as whether Rinehart acted correctly on September 8, 2005, whether she prepared her report properly, whether she acted appropriately when Dr. Rutherford challenged her report and its silence on the pop-off valve issue, or whether she disobeyed any orders from Chief McQueen or Dr. Jones.

The City correctly points out that Rinehart knew the circumstances that led to the charge against her and that she in fact presented extensive evidence about the events of September 8th. However, that fact does not excuse the City's effort to broaden the issues and the charges at this stage of judicial review. Also, because the City chose not to challenge directly Rinehart's actions on September 8th or her written report, the City did not present evidence that could have allowed the Board to find that Rinehart acted improperly. All the direct evidence about those events came from Rinehart and her witnesses. That evidence shows that Rinehart provided competent paramedic services. The evidence leaves an observer to wonder how Rinehart's and Dr. Rutherford's disagreement about the report was ever allowed by both sides to escalate to the point of termination.

III.    *Due Process, a Meaningful Opportunity to be Heard, and an Improper Delegation*

In the formal termination process, the City chose to proceed on the narrow theory:  (a) Rinehart's job with the fire department required her to be able to work as a paramedic, (b) Dr. Jones had conclusively decided that Rinehart could not work as a paramedic under his supervision, ergo (c) Rinehart could not do her job as a firefighter.  Q.E.D.

The problem with the City's theory is that it effectively nullified the protection of the merit statute and denied plaintiff a meaningful opportunity to be heard before she lost her job. The merit statute is intended to protect police

officers and firefighters from arbitrary firings and discipline, while at the same time protecting the public's interest in having competent and well-disciplined departments.  See *State ex rel. Burton v. City of Princeton*, 134 N.E.2d 692, 693-94 (Ind. 1956); *Pfifer v. Town of Edinburgh*, 684 N.E.2d 578, 581 (Ind. App. 1997). The protections are both substantive and procedural.  For example, a supervisor – even a chief – who is dissatisfied with the performance of a firefighter may not simply fire that person based on his own evaluation of her performance.  The supervisor must convince the chief, and both must ultimately convince the local safety board, that the employee in question is guilty of one of the specified grounds in the statute.  See Ind. Code § 36-8-3-4(b)(2).

The City's charge against Rinehart effectively delegated complete and unreviewable discretion over Rinehart's (and every other firefighter's) employment to the fire department's medical director.  Under the City's theory, it did not matter whether Dr. Jones was right or wrong, prudent or hasty, fair or arbitrary. All that mattered was that he decided he did not want Rinehart to work as a paramedic or an EMT under his supervision.  Under that theory, the Board of Works had nothing meaningful to decide. The Board's hearing on Rinehart's case was an empty formality.  It was not a meaningful opportunity to be heard.  Unless Dr. Jones changed his mind, nothing that Rinehart might show in the hearing could possibly have changed the decision to terminate her.

The City's theory is especially troubling because it would allow a fire chief to do indirectly what a chief may not do directly.  By persuading the medical director to suspend a firefighter's ability to work as a paramedic and/or EMT, a chief could nullify all the substantive rights under the merit statute.  The court is not finding as a fact that Chief McQueen pressured Dr. Jones to take the action he did.  The record shows, however, that Chief McQueen and Dr. Jones spoke about Rinehart's case roughly a dozen times before the hearing. Tr. 120.  From the evidence about the media attention the case received and the communications between the chief and the mayor, see Tr. 120, it might even be possible to infer that Chief McQueen and Mayor Fleming had concluded that Rinehart had become a political liability.  The court is not making a finding that that occurred, but the merit statute is intended to protect firefighters and police officers from just such unfair political pressures to find a scapegoat where there is not *actual* good cause for termination.  The City's legal theory is flawed because it would leave the road open for just such machinations at the expense of police officers and firefighters.  See generally *Ciechon v. City of Chicago*, 686 F.2d 511, 518-21 (7th Cir. 1982) (finding that city authorities bowed to pressure from media and family of patient who died and imposed unjust discipline on one paramedic).

The City also relies on a fire department rule requiring that a firefighter maintain his or her paramedic or EMT certification throughout the employment. Ex. D.  The problem with this theory is that Rinehart complied with this rule.  At all times, she maintained her state certificate as a paramedic.   The IDHS

proceeding did not result in suspension or revocation of her certificate, but only a reprimand and probationary period requiring additional professional education.

In the case of any other supervisor's criticisms of a firefighter's performance, Indiana law has provided clearly for many decades that the supervisor may not make a unilateral and unreviewable decision to terminate employment. The question here is whether a fire department's medical director has a different status that allows him to make such a unilateral and unreviewable decision that leads inevitably to a firefighter's termination.

The City relies on 836 Ind. Admin. Code § 2-2-1(e), which requires a paramedic provider organization like the fire department to have a medical director. The regulation provides:

> (e) The paramedic provider organization shall have a medical director provided by the paramedic provider organization or jointly with the supervising hospital. The medical director is responsible for providing competent medical direction as established by the medical control committee. Upon establishment of a medical control policy, the paramedic provider organization medical director and the chief executive officer have the duty to enact the policy within the paramedic provider organization and accordingly enforce the policy. The duties and responsibilities of the medical director include, but are not limited to, the following:
>
> (1) Provide liaison with physicians and the medical community.
>
> (2) Assure that the drugs, medications, supplies, and equipment are available to the paramedic provider organization.
>
> (3) Monitor and evaluate day-to-day medical operations of paramedic provider organizations.

(4) Assist the supervising hospital in the provision and coordination of continuing education.

(5) Provide individual consultation to paramedics.

(6) Participate in at least quarterly audit and review of cases treated by paramedics of the provider organization.

(7) Attest to the competency of paramedics affiliated with the paramedic provider organization to perform skills required of a paramedic under 836 IAC 4-9-5.

(8) Establish protocols for advanced life support in cooperation with the medical control committee of the supervising hospital.

(9) Establish and publish a list of medications, including minimum quantities and dosages to be carried on the emergency medical services vehicle.

(10) Provide liaison between the emergency medical service provider organization, the emergency medical service personnel, and the hospital in regards to communicable disease testing under IC 16-41-10.

The City relies in particular on subsection (7), the medical director's duty to attest to the competency of the paramedics. The City has not explained, however, how that administrative rule could override constitutional and statutory rights and allow a fire department to terminate or suspend a firefighter without due process, which requires a meaningful opportunity to be heard. Dr. Jones himself testified that he refused to talk to Rinehart about the case, so she never had a meaningful opportunity to be heard by the person who made the relevant decision. Nor has the City explained how the administrative rule requires it to put the medical director's decision to revoke privileges beyond review, effectively nullifying the protections of the merit statute.

During the hearing before the Board, there were indications that at least some members of the Board felt the fire department's contract with Hancock Regional Hospital required them to fire Rinehart in response to Dr. Jones's action. The contract provided in part:  "The Greenfield Fire Department shall terminate the service of an individual paramedic's responsibilities in the performance of advanced life support skills upon receipt of written notice from the hospital that such individual failed to exhibit satisfactory performance during the course of his/her duties in accordance with current protocols."  The City has not offered evidence of such written notice that Rinehart "failed to exhibit satisfactory performance during the course of her duties in accordance with current protocols."  Even if the hospital had given such notice, however, the City simply could not contract away the legal and constitutional rights of its firefighters.

Without resolving the issue, because it has not been presented by the evidence here, the court assumes that Dr. Rutherford and Dr. Jones had sincere and reasonable concerns about Rinehart's skills as a paramedic.  The court is also fully aware that the issues in this case, and the relationship among the fire department, the hospital, and firefighters, are important for public safety.  For generations, however, Indiana law has barred public officials who oversee public safety from making unilateral and unreviewable decisions to terminate police officers and firefighters.  That bar has applied no matter how reasonable, sincere, and fair those officials' decisions might be.  The Indiana legislature has balanced the relevant interests by requiring such officials to give the affected police officer

or firefighter a meaningful opportunity to be heard, and by requiring such officials to be able to back up their decisions with evidence that can withstand review by safety board members who have not been directly involved in the specific controversy.  A local government cannot nullify those important protections for police officers and firefighters by delegating to an outside contractor a power that not even the chief may exercise.

Nothing in this decision prevents a local government from disciplining or terminating a firefighter who fails to perform paramedic duties appropriately.  But those who criticize the firefighter's performance must be able to support the criticism with evidence that can withstand scrutiny and meaningful review.  Also, nothing in this opinion affects in any way the power of the Indiana Department of Homeland Security, which is responsible for overseeing the professional certification of paramedics and EMTs, but which acts under statutes and rules that provide procedural protections for paramedics and EMTs.  See Ind. Code § 16-31-3-14 (disciplinary sanctions and procedures).

Rinehart has also argued that the Board's decision to fire her must be reversed because it is based only on hearsay evidence.  Under Indiana law, an administrative body like the Board may consider hearsay evidence, but it may not base its decision solely upon hearsay evidence.  *U.S. Outdoor Advertising Co. v. Indiana Dept. of Transportation*, 714 N.E.2d 1244, 1251 (Ind. App. 1999), citing *Ram Broadcasting of Indiana, Inc. v. MCI Airsignal of Indiana, Inc.*, 484 N.E.2d 26,

34 (Ind. App. 1985); Ind. Code § 4-21.5-3-26 (in adjudicative proceeding, administrative law judge may admit hearsay evidence but decision may not be based solely on the hearsay evidence). In this case, the Board did not hear any evidence against Rinehart from anyone with first-hand knowledge of any basis for criticizing her performance. Dr. Jones had no first-hand knowledge of the September 8th run, and he had never observed Rinehart perform duties as a paramedic. The hearsay issue does not affect the City's narrow theory relying on its unlawful delegation of decision-making authority to the medical director. To the extent the City seeks to rely on those criticisms of Rinehart beyond the narrow charge against her, however, the hearsay problem is insurmountable on this record.[8]

In sum, then, the City failed to show that it had good cause for terminating Rinehart, and it failed to give her a meaningful opportunity to be heard. Her termination was arbitrary, capricious, and contrary to Indiana law. See

---

[8]The City has even tried to defend Rinehart's firing on the theory that she was fired for economic reasons, and that a firefighter who is fired for economic reasons is not entitled to a hearing. City Br. at 16, citing *Biddle v. City of Fort Wayne*, 591 F. Supp. 72, 81 (N.D. Ind. 1984); see also *Atkins v. Klute* 346 N.E.2d 759, 762 (Ind. App. 1976) (reduction in force of fire department for genuine economic reasons did not violate merit statute). The City later conceded that in such a case, a hearing is required but good cause is not. See City Reply Br. at 12 n.2. In either form, however, this theory attempts to nullify the merit statute's protections by circular reasoning. The City's theory is that because Dr. Jones had effectively barred Rinehart from working as a paramedic or EMT, it would have been a financial hardship either to add another firefighter who could work as a paramedic or EMT, or to hire a separate medical director willing to oversee Rinehart. The "economic" theory merely takes for granted what is in dispute here: whether the City had valid merit-based reasons for firing Rinehart, and whether Dr. Jones's refusal to work with her was conclusive and unreviewable.

*Rynerson v. City of Franklin*, 669 N.E.2d 964, 971 (Ind. 1996) (stating this standard); *Chesser v. City of Hammond*, 725 N.E.2d 926, 929 (Ind. App. 2000) (same).

In the interests of resolving this case without undue delay, the court must also point out that the administrative record shows conclusively that the City deprived Rinehart of property without due process of law. As a city employee who could be fired only for just cause, Rinehart had a property interest in her continued employment. *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 538-39 (1985); *Board of Regents v. Roth*, 408 U.S. 564, 576-77 (1972); *Jones v. City of Gary*, 57 F.3d 1435, 1440 (7th Cir. 1995) (Indiana firefighter had property interest in continued employment); *Parrett v. City of Connersville*, 737 F.2d 690, 694 (7th Cir. 1984) (interpreting Ind. Code § 36-8-3-4); *Ciechon v. City of Chicago*, 686 F.2d 511, 517 (7th Cir. 1982) (Illinois paramedic protected by due process); *Rynerson v. City of Franklin*, 669 N.E.2d at 967 n.2 (police officer protected by Ind. Code § 36-8-3-4 had property interest in continued employment protected by federal and state due process protections). Rinehart could be deprived of that property only through due process, which requires prior notice and a meaningful opportunity to be heard. See *Loudermill*, 470 U.S. at 542; *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976); *Schultz v. Baumgart*, 738 F.2d 231, 235 (7th Cir. 1984).[9]

---

[9]Plaintiff Rinehart has argued that any violation of the detailed requirements of Indiana Code § 36-8-3-4 amounted to a violation of her due process rights. The
(continued...)

The hearing in this case was not meaningful because the City proceeded on a charge and theory that effectively delegated the decision about Rinehart's employment to Dr. Jones. Based on the City's charge and theory, Dr. Jones's power was virtually absolute. His power certainly was not subject to any ascertainable standard. In saying this, the court is not suggesting that Dr. Jones was arbitrary or malicious or acted wrongly in any way. He testified that he was "not that kind of person" and "wouldn't do that." Tr. 181. That may well be true. But Indiana law does not put complete trust in the judgment of a fire chief, let alone a fire department's medical director. The point is that the City could not lawfully delegate the decision about Rinehart's employment to Dr. Jones, no matter how wise or fair his decision might or might not have been.

Dr. Jones himself testified that he gave Rinehart no opportunity to be heard. He relied on second-hand information to make his decision to revoke her privileges to work as a paramedic and EMT. Under the City's approach to this case, the relevant decision-maker was Dr. Jones. He refused to discuss the case with

---

[9](...continued)
Seventh Circuit has repeatedly explained that the federal Due Process Clause does not incorporate into the United States Constitution every detail of state and local laws, rules, and ordinances establishing procedures for employee termination and discipline. See, *e.g.*, *Wallace v. Tilley*, 41 F.3d 296, 301 (7th Cir. 1994), quoting *Osteen v. Henley*, 13 F.3d 221, 225 (7th Cir. 1993); *Schultz v. Baumgart*, 738 F.2d at 236. Rinehart relies on language in *Biddle v. City of Fort Wayne*, 591 F. Supp. 72, 84 (N.D. Ind. 1984), to the effect that "due process is satisfied only when there is cause for demotion as set forth in I.C. 36-8-3-4 and the procedures set forth therein are strictly followed." The court in *Biddle* was obviously correct in finding a violation of due process on the facts in that police demotion case, but the federal Constitution does not incorporate every detail of such state procedures.

Rinehart and certainly never gave her a meaningful opportunity to be heard. Under these circumstances, her termination deprived her of an important property interest without due process of law.

IV.    *Other Issues*

Rinehart has raised a number of other issues in her challenge to her termination.  She argues that she was harmed by the *ex parte* communications between Chief McQueen and Mayor Fleming.   She argues that she was denied equal protection of the laws, relying on a "class of one" theory.  See *Ciechon v. City of Chicago*, 686 F.2d 511, 522-24 (7th Cir. 1982) (finding that city violated equal protection rights of one paramedic when it disciplined her but irrationally failed to discipline another who was equally involved in incident).  Rinehart also argues that the City violated her right to free speech and her right to petition the government by punishing her for appealing the IDHS decision to reprimand her.

The court does not address or resolve these issues at this stage.  Rinehart's argument based on *ex parte* communications would require additional evidence, and it is not yet clear whether she would be able to raise this issue to the level of a federal constitutional violation.  Her equal protection theory adds nothing at this point to her federal claim under the due process clause.  There also is no need to reach the First Amendment claims at this point.

*Conclusion*

The administrative record shows conclusively that the City violated Rinehart's rights under the Indiana merit statute when it terminated her employment. She is entitled to immediate reinstatement with back pay and benefits. It should be clear from the court's decision that the court is not saying whether Dr. Jones did or did not have sound reasons for taking his action. Nor is the court saying that the City could not have terminated or disciplined Rinehart based on the events of September 8, 2005, her report, and the aftermath with Dr. Rutherford and Dr. Jones, if the City had given her notice of proper, detailed charges that complied with the requirements of the merit statute and a meaningful opportunity to be heard on those charges. The court is holding that the charge and procedures the City actually used to terminate her employment violated Indiana law. The court will hold a status conference with all counsel at on Friday, April 27, 2007 at 10:00 a.m. in Room 330, Birch Bayh U.S. Courthouse, Indianapolis, Indiana, to discuss the next stages of this case.

So ordered.

Date: April 12, 2007

_____
DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Kim F. Ebert
OGLETREE, DEAKINS, NASH, SMOAK & STEWART
kim.ebert@ogletreedeakins.com

Paul T. Fulkerson
SKILES DETRUDE
pfulkerson@skilesdetrude.com

Keith A. Karlson
LANGENBACHER KARLSON LLC
keith@lkindy.com

Matthew Gerard Langenbacher
LANGENBACHER KARLSON LLC
matt@lkindy.com

Bonnie L. Martin
OGLETREE, DEAKINS, NASH, SMOAK & STEWART
bonnie.martin@odnss.com

Christopher L. Riegler
HALL RENDER KILLIAN HEATH & LYMAN
criegler@hallrender.com

Craig M. Williams
HALL RENDER KILLIAN HEATH & LYMAN
cwilliams@HallRender.com